You're familiar with our lighting system. When the yellow light goes on, that means your time is starting to draw to a close, so begin to wrap up. If we take you beyond the light, then don't worry about it and just keep talking as long as we'll we'll have you. And with that, we'll start with our first case, number 16-14112, Matthew Hinson v. R.A. Bias, et al. Mr. Feser. Good morning. May it please the court. My name is Craig Feser and I'm with the Office of General Counsel for the City of Jacksonville and along with my Let me tell you straight up front the problem I have with your case and see if you can help me out. Yes, sir. You've got three claims in this case. There's an excessive force claim, there's a failure to intervene claim, and there's a deliberate indifference claim. And I thought the district judge did a pretty good job in denying the motion for summary judgment, setting out why there are so numerous genuine issues of material fact in this case, especially when you consider the two surveillance cameras in light of the testimony. So, what did the district judge do wrong in denying summary judgment? Yes, sir. What the district judge did in the order is essentially credit two pieces of evidence essentially on Hinson's behalf. One is his complaint, which if you look at the He doesn't remember anything from the evening in question at all. And he admits really in the complaint itself and certainly in his deposition that everything in the complaint doesn't come from his own knowledge. It comes from things his father told him or it comes from essentially speculation and things that he's just alleging. What about the surveillance cameras though? When we look at the red brief in this case, the red brief did a good job of showing pictures in there of what these two different surveillance cameras show. And then when we look at the picture of the plaintiff himself and the injuries he received as a result of the alleged excessive force and there was no treatment for nine hours, I mean to me this case is just full of genuine issues of material fact. There is no genuine issue of material fact in this case, Your Honor, and it's for a simple reason. One is on the one side of this case you have a lot of sworn testimony from the officers, experts, documentary evidence, all of which sort of fills in the blanks of what the surveillance video doesn't show. If it is inconclusive in spots, they're telling you, and keep in mind, the Graham case from the U.S. Supreme Court says we're supposed to look at this from the perspective, objectively though, from the perspective of the officers at the scene at the time, not in 20-20 hindsight seven years later. We're supposed to look at it from what they saw that evening. They're telling you in all their declarations, their sworn testimony, what was going on, what they were perceiving. Keep in mind, this is a person who had just slashed somebody's throat, bleeding to death over at the landing, trying to leave the scene, has the victim's blood actually on him, truck's running, they get a call, this person's tried to flee the scene of a stabbing. They show up, they put their, this is what the video shows. If you look at the two dispositive clips, and we urge the court to look at the video that's actually in the record, because the two clips that are dispositive here are camera five and camera six, both of which clip three on each one. Clip three on camera five shows you sort of the bird's eye view, and you see the officers come up, the two plainclothes officers, Kremler and Anderson, come up with their guns drawn, and they're telling him, they say that they're telling him, put your hands up, put your hands up. He doesn't even do that right away. He's got one hand down, he's got another hand up. Officer Kremler says he can't even see his other hand. You can see him moving around in the cab of the truck, still running truck, and they're telling him, put your hands up. Doesn't comply with them immediately. Eventually, he sort of does put both hands up, and they can kind of see him, but he still doesn't get out of the truck. At this point, the other two officers show up. He's not getting out of the truck. He's still sort of sitting in the truck until finally Officer Bias tries to open the truck door. Keep in mind, this is really close quarters. We're talking about the Jacksonville Landing parking garage, and it's a meter. There's a pillar, and then there's a meter, and the truck's wedged in between them, and there's not a lot of room to move around here, and this is a... No one, no one is, well, I shouldn't say no one. From my perspective, I'm not questioning what the officers did to get him out of the truck. I completely understand that, given the circumstances, but there's evidence in the record, it seems to me, viewed in the light most favorable to Mr. Hinson, that the police officers, or at least some of them, used force that was not necessary once he was compliant and subdued. Why doesn't the video support that version of events? Your Honor, respectfully, there's nothing in the video that tells you he was compliant and subdued. There's nothing in the video that shows that he wasn't compliant completely with the police officers' version of events. Correct, and that's where the officers are telling you what's happening. That's their testimony. That's what they're saying, and keep in mind, Hinson has nothing to contradict that. Well, you say nothing, but you're saying he recalled nothing at all at the deposition? He recalled nothing at all, and he says that repeatedly, over and over again. He seems to somehow remember what happened at the landing. He remembers, he thinks that he was maybe attacked by the victim, and then he had to stab him, and things like that. He remembers sort of the events kind of leading up to it, but then he says, you know, next thing I know, I'm in the back of a patrol car. He literally remembers nothing, and again, if you read his testimony, he says it over and over again. So you have really a blank on that side, and you have the officers telling you what happened on the other side. Every single qualified immunity case in this court where qualified immunity is perhaps denied because the plaintiff actually remembers and has a story, has a version of the events. Maybe he has witnesses. Maybe he even has experts. He has a version of events. Well, let me give you one example of the video. Doesn't the video show that when Mr. Hinson fell on his way to the police car after having been subdued, and he fell, that one of the police officers kicked him in the torso and waist area? Two things about that, Your Honor. First, yes or no? No, no. We don't believe that it shows a kick. What does it show? Maybe it shows a nudge. Maybe it shows he's trying to get him to get up, but again, that's a red herring because that's not even an officer that's involved in this lawsuit at all. That's the officer that transported him. So even if that was force used, it wouldn't have any relevance to these particular defendants and the claims against them. We don't think that there's force there. At best, it's inconclusive as to exactly what that was, but it has nothing to do with the actual allegations in this case against these defendants. What happened here was they pull him out of the car. He's out of the truck and it's still running. One of the officers actually has to shut the truck off. Of course, one of the things that Hinson says he remembers here is that, oh, I shut the truck off and put my hands up. Both of those things are actually contradicted by the video. He doesn't turn the truck off. An officer does. He doesn't immediately put his hands up. They pull him out of the truck and keep in mind what they're seeing here. They've got a fleeing murder suspect and they pull him out of the truck and what do they see? They see a bloody knife on the ground, on top of it. At this point, they don't know. They have a truck that's still running. They don't know if they've got an armed suspect. They don't know if he's got another weapon on him. There's certainly no clearly established law in this circuit that says they can't at that point take him to the ground. They need to get him in handcuffs immediately. This is a busy parking garage. You've got people walking all over the place and you've got officers who literally don't know what they have in front of them. You've got obviously the most serious crime you can imagine and that's a factor under Graham. And they reasonably would fear for not only their own safety in this close little quarters, but the safety of the public. They need to take him to the ground. They need to get his hands behind his back as quickly as they possibly can. When they get him to the ground, he doesn't have his hands behind his back. That's what they're telling you. It's difficult to see that from the video, admittedly, because you've got sort of a parking sign that blocks your view when you're watching it. First of all, that camera is 47 feet away. Your point is that you've got the officer's testimony that they need to get his hands behind his back and they're not behind his back and there's nothing in the video that contradicts that. Nothing at all. There's nothing in the record that contradicts the officer's testimony. So even if you look at the record in the light most favorable to you, there's nothing to look at on his behalf. Right. There's no argument here that the officers were performing a discretionary function in arresting this person. And so the burden shifts to him to produce some sort of material evidence to overcome qualified immunity. He doesn't have anything. He doesn't have his own knowledge of the events and he doesn't have a video that shows you anything that blatantly contradicts what the officers are telling you. I would argue that when you watch the strikes that were given to Hinson, it clearly, it's pretty clear that they're hammer strikes and they're compliance strikes. That's what the officers are telling you. He doesn't have his hands behind his back. Get your hands behind your back. That's what the strikes are for. And you really, if you look closely, it almost looks like, although it's hard to see, it's hard to tell admittedly, that his hands come up and they cuff him. And once they cuff him, these officers disperse. They're gone. Another officer, Officer Janes, is the one that drives up, puts his gloves on, because keep in mind, Hinson is covered in the victim's blood. I mean, he's got it on his hands, he's got it on his pants, he's got it on his shirt. Another officer puts gloves on and picks him up to take him to the patrol car. Everything after that, the falling down and whether or not he kicks him or anything, that's a red herring to this case, because it has nothing to do with what these officers did at the time. What they perceived at the time was a fleeing murder suspect with blood on him that they needed to get in handcuffs immediately. And they've got the public walking all around at the time as well. So if qualified immunity doesn't apply here, it's literally an outlier compared to this court's other cases, because in the other cases, you really do have evidence on both sides. And when you have evidence on both sides, of course you have to take the evidence in the light most favorable to the plaintiff. Therefore, Hinson's story would have to prevail if it presents material issues of fact. You don't have that in this case. You have nothing on one side, you have a mountain of evidence on the other side, and you have a video that really supports what the officers are saying. I mean, it follows their story. They fill in the blanks, but it follows their story, it follows their testimony, and in whatever place it's not conclusive, it certainly doesn't support what the plaintiff is saying and it doesn't support or it doesn't contradict what the officers are saying either. So clearly the judge erred in not granting qualified immunity on the excessive force claim. What do you say about the picture of the plaintiff in the red brief? Absolutely, it's essentially sustained road rash, to use a colloquial term. That's what he sustained. He sustained some abrasions on his face, which our expert specifically said in her declaration, were likely caused by rubbing up against a pavement during the struggle. Whatever force was used here, there's no evidence in the record. Even the gashes? There's no evidence that he had any gashes. There may be evidence. You're looking at a different picture than I am. He doesn't just have scratches and abrasions. He has abrasions and abrasions that rub the skin off and all that. By the time he's interviewed, they're not even bleeding anymore. You can watch the interview footage. What about his wife's testimony? His wife comes into the interview room and, you know, she does say to him a couple of She says, he kept bleeding. She says, don't bleed on me. That's what she says to him. But he's not bleeding at the time. In fact, if you watch the entire interview footage, he submits to two separate interviews. The first one is right after they get him there. And you can watch that footage all day long, and all you see is Hinson kind of putting his head down, rubbing his face, talking very lucidly to the officers, never saying anything that he's in any sort of pain or he has any issues or that he's bleeding. There's no evidence that he's bleeding. He's lucid, and he's actually asking what happened and am I in big trouble, all those kinds of things during the first interview. Then he comes back for a second interview. He goes to the jail and actually comes back and talks to them again. Never, ever at any point does he complain about any sort of medical emergency, injury, pain, anything. This is Yeomans all over again. If the court looks at their Yeomans case, this is lesser injury than that case. And in that case, you had a particular suspect that actually showed signs of pain. He said, ouch, oh, my hand, oh, I'm hurting. You have none of that here. You have Hinson literally submitting to interviews without any indication of the officer. And they have to subjectively know this. They have to subjectively know, oh, there is a plainly obvious need for immediate medical attention. One last question. What is the status of the criminal case? As far as I know, the status of the criminal case is there was apparently it went up and sort of like an ineffective assistance kind of a claim. And I think the First District Court of Appeal may have said that some factual findings weren't properly made and remanded it back down. I'm not certain as far as where that stands now other than Hinson is still in prison and there hasn't been any change in that status. All right, thank you very much. Thank you, sir. You saved your time for rebuttal. Yes, sir. Mr. Leppert. May it please the Court, Val Leppert for the appealee and Mr. Matthew Hinson. Let me start with Judge Dabena's question. Does this tell us of any genuine issues or material facts in this case? Absolutely, they are. As the district court found on page 11 of the district court's order, the district judge laid out all the disputed issues, and that is mainly whether he resisted, how he resisted, if at all, whether he was noncompliant. There's a question of fact on that issue, and that's really the key issue there. I mean I think they're conceding the use of force. They're disputing the kick. Let me ask you a question. I'll tell you where I have some concerns. It seems to me that with respect to whether there was use of excessive force, et cetera, we have the officer's version of events and we have the video, and that's all of the evidence there is on this issue. First, if you want to correct me if there's something that I'm leaving out, if you want to do that, go ahead and do that now. Okay. It's twofold, Your Honor. First, what we do have with personal knowledge testimony. Who's personal knowledge? Plaintiff's personal knowledge. My client's personal knowledge. He doesn't remember anything. He remembers up until the point that he was arrested that he put his hands up. He says on page 80 of his deposition when he was confronted with the guns pointing at him, he put his hands up, and then he says, I'm trying to do everything they wanted me to do. That's on page 84. That's up to the point. He's still sitting in a truck. That's the point up until he has personal knowledge. Okay. He has no personal knowledge after that though, isn't that right? That's correct. And on that front, after that point, you're right. We're relying on the video plus circumstantial evidence. What is the circumstantial evidence? He's not resisting or that this level of force was not necessary. Well, let me stop you for a second because he's not resisting. We would need evidence for it, not circumstantial evidence, right? I mean, and so I'm asking you what the evidence is that he's not resisting. And it seems to me that there are two sources of evidence at this point. One is the officer's testimony, and two is the video. Is there anything else other than those two things that we can look to in the record to determine what happened after, you know, at the time of the arrest? Yes. He was never charged with resisting arrest. Okay. I mean, he doesn't have to be charged with resisting arrest because he's charged with murder. I'm not saying they have to, Your Honor. I'm saying it's circumstantial evidence that buttresses our view of the video and the district court's view of the video. I'm sorry. Is there a witness? Is there any other witness? Is there any tangible evidence? Is there anything else other than the video and the officer's testimony? We don't have any other witnesses on that point in the record as it stands now. There are parking lot attendants. We don't have any interviews of them. My client was pro se in the court below, was in prison in Costco. And I understand, and we certainly appreciate your service here. But my question is, if those are the only two sources we're looking at, then isn't it the case that either we have to find some kind of internal inconsistency in the officer's statements themselves or something in the video that contradicts, affirmatively contradicts, what the officers have said? Do you agree with that? And if you don't agree with that, what do you think the standard is that we're looking at? I think the standard is that a reasonable juror should be able to look at that video and agree. Well, I'm sorry. My question, though, is we've got the officer's testimony. Do you think there are any internal inconsistencies among their testimony that automatically raises an issue of fact or something of that nature? There are definitely three inconsistencies. Material ones. Well, number one, the first thing you have in terms of inconsistency is they claim that they had to extract him out of the truck. That's just not true. When you look at the video, you can clearly see that he's coming out.  He's coming out with his hands up, slowly exiting the truck. They say they had to extract him. Number two, they also say that he charged, but actually that the knife fell out, that the knife fell out as he's being extracted. That just raises their awareness. That's just not true. You can see it on the video. It's at 3429 when he throws the knife out, puts his hands up, and then he's sitting there for basically another minute until support gets there. That's another statement in a sworn affidavit that just isn't true. Then number three, you have the claim that once he's out of the truck, he's charging towards Officer Baez. That necessity of taking him down, and that's raised the awareness level. Just not true. We put an arrow on it in our brief in the picture. When you look at 3554-55, you see him standing there, standing still. He's never charging. He's standing still for two seconds before he's being thrown to the ground. Okay, so your argument is that, in fact, we do have to decide based pretty much solely on the officer's testimony and what's in the video. But your position is the video is enough to contradict the officer's testimony and raise a material issue of fact. Is that right? That is correct, along with circumstantial evidence I wanted to get to because I didn't fully get to it. The first thing is, on the officers themselves, when you look at their behavior as he's on the ground, their version of the story is that at that point they have to beat him six times in the back, one time in the face, because they couldn't get his hands or because there's resistance. There are five officers on the scene, Your Honor. Three of them stand around. They'd all put their guns away. If there was a threat to anyone's safety, they wouldn't have put the guns away already. Everybody had put their guns away, and the three officers that are on the scene, he's surrounded by a total of five. They do not seem concerned at all. They're not worried about safety. Well, let me say this. I watched the videos. Not only did I watch that one. I watched the two of him giving the statements at the office. And it looks to me, when you watch the video, like they can't get his hands out because as soon as you can see the part where his hands are lifted up and they're cuffing him, and there is no further striking of any type at that point. So if you look at that part of the video, it seems at least clear to me that since he's being handcuffed at that point, that is consistent with what the officers say, or at least the video doesn't contradict what they are saying. But maybe you think I've missed something, and I'm happy to go back and review it again if you think I have. Apparently, I don't see the cuffing on the video. You can't see it close up, but what you can see is you can see the officer bending down, and he appears to be handcuffing the hands. He's got them together, and he's handcuffing them. That's a possible viewing of the video, and that's why we bring in jurors to decide different reasonable viewings of what's happening on that video. That's why the district court looked at it and looked at the video on multiple aspects, page 15, 16, page 23, 24. They're asking the district courts looking at the video and saying it supports our version of it. As to the handcuffing and the use of the force, at that time, the district court didn't see a struggle for the hands. I don't see a struggle for the hands, and that's their version of the event. It is rebutted by the video viewed in a light most favorable to us, and all that this appeal is about is to have three judges on an appellate bench look at the same video that a federal district judge looked at and say, oh, it doesn't show that in a light most favorable to us. That's really not what appellate review from the denial of qualified immunity is about. Well, I think what it's about is we have to look and see whether there is a material fact that's an issue. And the question there is whether there's something in the record that contradicts the officer's testimony. And if there is, then there's a material fact, and it relates to a material fact, then summary judgment and qualified immunity should have been denied, as it was. But if there isn't, then it should not have been denied. And I think you're in agreement with me on that standard, unless I'm misunderstanding. Do you agree that unless there's something in the record, and maybe there is. I'm not saying whether there is or there isn't, but I want to make sure we're in agreement on the standard. We've got to look to see if there's anything in the record that contradicts those officers' testimony, and because the only thing that seems to be in the record, besides the officer's testimony, after the point of the arrest, is the video. We have to look and see if there's anything in the video that contradicts it, right? I mean, isn't that what we have to do? First of all, yes, I do think the video. We have to have a version of events, and that for us is the video plus circumstantial evidence. There's no doubt about it. I don't want to sugarcoat that. But the point on top of it is a jury doesn't have to necessarily believe the self-serving versions of these officers. They haven't been subjected to cross-examination yet. They haven't even been subjected to a deposition. And I agree with you. If there's something that undermines in any way or causes a material issue of fact in any way with respect to what they've said, but if there isn't, I mean, if it's uncontradicted in any way, then don't we, I mean, isn't that the standard? Don't we have to accept it at that time? As I pointed out, there are three points where there are sworn affidavits that have not even yet been subjected to cross-examination, are contradicted by the video, plainly contradicted by the video. I pointed those three out. That's number one. Number two, when you look at the video and the district judge looked at the video, there is no struggle for the hands. They already had the hands twice. You see it on the video that Officer Bias has the hands with no resistance as he's guiding him through the pathway. That is at 3543 of the video. He's got the hands, no resistance. Then there's the straight arm takedown maneuver. Officer Anderson has the left arm in that process as he's taking them down. So these officers are saying we had to use six strikes to the back, one to the face to get his hands, even though they already had the hands twice. They already had the hands without resistance, and they now want to say all of a sudden they had to use that level of force when he's on the ground surrounded by five officers who had put their guns away and were not showing any kind of concern for officer safety at that point. Could I ask you to, in the amount of time you have left to discuss the deliberate indifference claim and why you think the district court properly denied summary judgment on qualified immunity with regards to that claim? Absolutely. As the district court pointed out, delay of treatment here was nine hours. He checks into the station at 1240. He's not seen by a certified medical assistant until 940 in the morning, roughly nine hours later. This court's cases have looked at delay in treatment. The Aldridge decision from 1985, a two-and-a-half hour delay was deemed objectively unreasonable. But the delay depends in part on context and what the injuries are, right? If you have a scratch on a finger, a delay of five hours may not be problematic. If you have a more serious injury, a delay of an hour may be catastrophic. So why were the injuries here of the nature that they required some sort of treatment at an earlier point in time? It's twofold, Your Honor. Number one, there's evidence that he would have lost consciousness during the event. He says that to them, that he may have lost consciousness. He doesn't remember what happened. He was knocked down to the ground or his head hit the ground, certainly on the straight-arm takedown. Then he was punched in the face. All of that is uncontested by everybody's version. Number three, he falls right back to the ground as they stand him up, and then he hits the ground again with his hands behind his back. So from that, certainly there's a question as to whether he lost consciousness. When you look at the department policy, it tells them that if a suspect has lost consciousness, that it should be a medical evaluation as soon as practical or possible. As to the cuts, you have him bleeding for multiple hours. You have the wife comes into the room and dabs his bleeding wounds and says, don't bleed on me. This is during an investigation. When you look at page 107 of his deposition, this is something of which he has personal knowledge. This is your client's deposition, not his wife's? Correct. Okay. Sorry. He does have personal knowledge of that, and he says, yes, I was sitting in the room and I was bleeding. Although when he's asked if he needs anything, he says he's fine. And if you watch him during the actual interviews themselves, he seems to be perfectly coherent, not in any pain whatsoever, not in any discomfort whatsoever. I mean, do you disagree with that? Well, I don't think we can look at this video and then say you have a sworn testimony from him and say, well, you don't look like you were in pain, hence you weren't in pain. That creates a question of fact. Well, but the testimony says he was bleeding, right? Right. Okay. If you look at the video, I mean, it doesn't look like he's – don't get me wrong. The injuries are terrible and very unfortunate. But from the standpoint of, you know, was he gushing blood or anything like that, some of them seem to be scabbing over. I mean, some of them were still wet, but they weren't dripping blood. They didn't appear to be in the video. There was nothing that in the video when you looked at it looked like the guy, you know, needed to get to a trauma surgeon or something immediately. I mean, I'm not suggesting one way or the other whether it was deliberate ignorance. I just want to make sure we have the factual record straight. And my question for you is whether you think there's something in the video that I may have missed that contradicts that. No, I don't think so. I don't want to overstate my record on this. I'm not trying to say to you that basically, you know, this looked like a gushing wound or blood just dripping all over him. You know, I'm not trying to create that impression. But he was bleeding. The cut was bleeding. And he had swelling on his head from the impact. And you can tell the type of force that was used against him that, you know, it's pretty severe force. I mean, you get punched in the face, and that's why their own department policy says that if a suspect shows any injury from any use of force, you should let them see a medical professional as soon as possible or practical. And that just didn't happen here. One possible answer to the question is that if the defendants are right, that their testimony fills in the gaps that are not told to us one way or another definitively by the video, the same thing happens with deliberate indifference claim. The testimony of your client and his wife fill in the gaps that are not told by the video at the station. Right, but of course my position on the excessive force claim. No, I understand. I'm just saying that, you know, if you're going to allow testimony to fill in gaps that are left via video, you have to do it both at the scene of the takedown and arrest and at the police station too. It can't be one way and one not the other. That's correct. All right, thank you so much. Thanks so much, Your Honor. You've got your time left, Mr. Fieser. Five minutes. Thank you, Your Honor. Just to try to address a couple of things, both on excessive force and deliberate indifference. Let's start with this. And I don't know whether this drives the decision in the case or not, but I do think that Mr. Leopard is right about one thing, that a couple of the things that the officers say in their affidavits are contradicted by the video about his actions in the truck and getting out of the truck. Are they not? I don't think so, Your Honor. You think that he – okay, tell me what you think was correct about the testimony of the officers about what he did in the truck and what he did – doesn't the video show that he did not come toward the officer? It's hard to tell from the video, but I will say that Officer Bias is the one who has to open the truck door and does – to suggest that he's not extracted from the truck is just incorrect. He is pulled out of the truck. You can see that in the video. And then when he's pulled out of the truck, it does look as though he sort of pulls away, and it looks like he's not complying with what they're telling him to do. But you're saying it looks like – I'm saying it looks like, and this is at least in some scenarios with regard to some of the facts, whatever they may be, the video is not conclusive. It may not be conclusive, and it may not show everything that the officers were seeing, and it may not show everything that was going on, but it doesn't contradict what the officers are telling you. Officer Bias is telling you, I'm trying to get him turned around, put his handcuffs on. Didn't they have one of his hands when they took him down to the ground? Officer Anderson took him down to the ground as he's trained to do with a straight-on bar takedown. At that point, he sees the bloody weapon laying there. They hadn't seen the weapon before when he threw it out. He says that he didn't – he thought that it fell out of his lap. Regardless of whether it fell out of his lap or he threw it out, all the officers see it laying on the ground. At this point, they don't know if he has another weapon. It turns out he does. There's actually another knife in the truck. My question only is do they have control of one of his hands when they take him down? They do an arm bar takedown, but once they get him to the ground, they say that they do not, that they have both of his hands underneath. How does that happen? I'm not sure how it happens, Your Honor, but that's what they say happens, that he does not have a hand free when they get him down onto the ground, whether he pulls his hands underneath it. The arm bar takedown is an arm behind the back, right? It is – yeah, it is a takedown, and again, I'm no expert in that technique, but it's a takedown to the ground. With the police officer following on top of him so that he can't – Putting his knee on top of him saying give me your hands, give me your hands. And on the way down from an arm bar takedown performed by an experienced police officer, he somehow puts that hand underneath his body. That's what they say. They say that he does not have his hands free, that he does – he has not put his hands back so that they can put him in handcuffs. There's nothing in the video that says otherwise. In fact, the video, as Judge Rosenbaum pointed out, looks as though he does actually eventually put his hands up so that he can be handcuffed. Keep in mind that when you watch it, you can see that what the officers are telling you is that this is a brief struggle. This is a five-second at most struggle to get his hands behind his back. This is a very short duration of force, and the strikes that actually are applied clearly look like they're applied because of a struggle. See, I think you may be right at the end of the day, but you're not viewing the evidence in the light most favorable to him because there's no way that you can hit him five times and then a sixth time with something, a hand, a flashlight, whatever it might be in the face, in five seconds. A human being can't do that. You strike, you move the hand back, you strike, you move the hand back. Which is not – when you watch it, that's not what you see. You don't see strike, move the hand back, strike. You see this kind of thing. You can literally count it off. It's at least under ten seconds, more closer to five seconds. And it is quick, and it is the type of thing that suggests clearly that a struggle is going on to get him in cuffs. And once he's in cuffs, that's it. All these officers say they have no further contact with him. Most of them resume their patrol. And so clearly, as far as the deliberate indifference claim, none of the officers on the scene could have possibly been deliberately indifferent to a serious medical need when they left. They didn't even have anything else to do with him. The transporting officer, Officer Jane, says he gets him in the car. He's staring out the window, and he asks him, are you okay? Are you okay? And he says nothing. He doesn't give any indication that he needs any medical attention. He gets to the jail, and those officers that are interviewing him, not defendants in this case whatsoever on any claim, ask him again and again and again, are you okay? Are you okay? You seem to be okay. You want to talk to us? They're trying to make sure that he doesn't want a lawyer. He's talking to them. Eventually, he comes back for another interview. All these things clearly suggest that they're not subjectively aware that he has some sort of emergency medical need that they need to get him to the hospital. Clearly, there's no material fact on that claim either. So we would argue there's no material facts. Qualified immunity, if you follow what this court has done in every qualified immunity case cited by both sides, this fits right into where qualified immunity should be applied on summary judgment based on the evidence. All right. Thank you so much. Mr. Lepper, we know that you were court appointed to represent Mr. Hinson, and we certainly appreciate your taking on the case and doing a good job for him here today. Thank you. Thank you.